1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11   JOSHUA JASON HENRY,                Case No.:  3:19-cv-00890-NLS

12                         Plaintiff,   **ORDER:**

13   v.
                                        **(1) GRANTING IN PART**
14   ANDREW SAUL,                       **PLAINTIFF'S MOTION FOR**
                                        **SUMMARY JUDGMENT [ECF No.**
15   COMMISSIONER OF SOCIAL             **18]; and**
16   SECURITY,
                                        **(2) DENYING DEFENDANT'S**
17                         Defendant.   **CROSS MOTION FOR SUMMARY**
                                        **JUDGMENT [ECF No. 19]**
18

19

20        Joshua Jason Henry ("Plaintiff") brings this action, seeking judicial review of the

21   Social Security Administration's ("Defendant") final decision denying his claim for

22   disability insurance benefits under Title II and supplemental security income under Title

23   XVI of the Social Security Act.  ECF No. 1.  The parties consented to proceed before a

24   magistrate judge.  ECF No. 4; *see* 28 U.S.C. § 636(c)(1).  After considering the papers

25   submitted, the administrative record, and the applicable law, the Court **GRANTS IN**

26   **PART** Plaintiff's motion for summary judgment and **DENIES** Defendant's cross motion

27   for summary judgment.

28        //

                                        1

I.   **BACKGROUND**

   A.   **Procedural History**

On March 30, 2015, Plaintiff filed a Title II application for Social Security Disability Insurance and a Title XVI application for Supplemental Security Income, alleging a disability onset date of July 14, 2014.  Administrative Record ("AR") 20.  The Commissioner denied Plaintiff's claim initially on August 4, 2015 (AR 83-101, 102-120), and on reconsideration on December 24, 2015 (AR 123-140, 141-158).  AR 20.  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 13, 2017.  *Id.*  Plaintiff was represented by counsel at the hearing, during which Plaintiff and vocational expert ("VE") Alan L. Ey testified.  *Id.*

On March 2, 2018, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from July 14, 2014 through the date of the decision.  AR 20-31.  Plaintiff filed a Request for Reconsideration on May 1, 2018.  AR 4.  On March 16, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for judicial review purposes.  AR 1-6.  Plaintiff timely commenced this action in federal court.

   B.   **Plaintiff's Background and Testimony**

Plaintiff was born on December 23, 1974.  AR 29.  At the time of the hearing, Plaintiff had lived with his mother for the past eight years.  AR 46.  Plaintiff has a driver's license and drove himself to the hearing.  AR 47.  Plaintiff is a high school graduate.  *Id.*

Plaintiff testified that he spends his average day watching television or reading books.  AR 60.  Aside from that, he reported that he does not do very much.  AR 60.  Plaintiff also testified that he enjoys going out to the movies with his mother.  AR 60-61.  For exercise, Plaintiff reported that he walks for 30-45 minutes several days a week.  AR 62.

Plaintiff stated that he performs chores and does "everything he possibly can" to

help out at home.  AR 60.  This includes taking out the trash and recycling, doing the dishes, and cleaning the home.  *Id.*  Plaintiff specifically noted that his mother has not done the dishes since he has lived there, and that he does all the cleaning.  *Id.*  Plaintiff also testified that he prepares his own food, but this usually involves placing something into the microwave or oven.  *Id.*  Plaintiff further stated that he does grocery shopping with his mother and will unload and put away all the groceries.  AR 61.

Plaintiff previously worked in the grocery market field, performing various duties.  AR 48-49.  Plaintiff testified that he performed almost every position one could imagine, except for management.  AR 48-49.  Plaintiff's duties included stocking and breaking down product, taking product inventory, communicating with management, and handling employment schedules.  AR 49-51.  Plaintiff was fired from his most recent job in July 2014.  AR 52.  Since then, Plaintiff has performed odd jobs, such as watering and repotting plants for his mother's friends for spending money.  AR 52.

Plaintiff stated that he was fired for not showing up or calling in to his previous job.  AR 53.  Plaintiff reported that he did not show up because of his depression.  AR 53.  He described waking up in the morning and not caring about anything, including the consequences of his actions.  *Id.*  He testified that at those times, he did not want to be conscious, present, or alive.  *Id.*  Plaintiff reported experiencing his symptoms of depression all the time.  AR 56.  In his own words, "if I'm awake[,] I'm depressed."  *Id.*  But he stated that he only experienced episodes where he cannot function three to four times a year.  AR. 55.  He testified that these episodes usually last a couple of days and during these times, he felt he could not bear to be responsible for anything.  *Id.*  Plaintiff reports that he feels that he does not want to be around all the time.  AR 59.  While he does not wish he were dead, he stated that he cannot stand to be alive in "this body with this mind."  *Id.*  However, Plaintiff testified the he will "stick around" because he would not do anything to hurt himself or his mother.  *Id.*

Plaintiff stated that he was first diagnosed with depression at age 15 and since then, has been trying different types of therapies and medications.  AR 57.  He relates that

3

although his medication had elevated his mood a little bit, he has never been able to go to his doctor and say "this is really helping me." AR 57-58. To date, Plaintiff estimates that he has tried 40 to 50 different kinds of medication. AR 58. Plaintiff also testified that he had been seeing therapists for as long as he could remember and that he had 12 to 15 sessions of electroconvulsive therapy ("ECT"). *Id.* Plaintiff related that his ECT session did help somewhat, but had negative side effects on his memory. *Id.* While the ECTs did not affect Plaintiff's memory "horribly," his mother and brother still had to remind him of events that occurred a couple of years ago. *Id.*

Aside from his depression, Plaintiff also reported problems with his appetite and experiencing severe anxiety. AR 54, 59. Plaintiff testified that he had problems with his appetite starting from six or seven months prior to the hearing. AR 54. He reported that it had "gotten really bad" and that his doctor referred him to a dietician. *Id.* He testified that he was only eating once a day. AR 55. Plaintiff also noted that he has severe anxiety, which manifested in clammy hands, sweating, and shaking. AR 59. He reported feeling anxious any time he needed to be around or speak to another person, and that this was especially debilitating in conjunction with his depression. *Id.*

Plaintiff testified that he had thought of applying to other jobs, but decided against applying because he did not believe he would be successful at them. AR 63-64.

### C.   Plaintiff's Mother's Third-Party Function Report

Plaintiff's mother, Jeanette E. Reynolds, submitted a Third-Party Function Report, dated April 29, 2015. AR 295. In her description of Plaintiff's condition, she wrote that he was unable to go to a job consistently, because he could not get up in time, did not call in on time, sometimes forgets his schedule, and is too depressed to go to work or do much of anything but sleep. *Id.* She also wrote that he sometimes sleeps only a few hours, and sometimes cannot get out of bed and sleeps all day, as a result of his condition. AR 296. She further opined that his depression had become more debilitating over time, and that he must be prompted to eat sometimes. AR 297.

In terms of daily activities, she wrote that Plaintiff watched TV, played guitar,

4

played video games, and fed her cat while she was gone.  AR 296.  She further noted that Plaintiff could do his own laundry, water the yard, sweep, and do dishes, but the frequency of these activities depended on how depressed he was.  AR 297.  She also wrote that Plaintiff would get out of his apartment several times a day, briefly, to go in between his apartment and his mother's apartment, and that he drove once or twice a week to appointments or to buy fast food and cigarettes.  AR 298.  She wrote that Plaintiff was unable to pay bills, handle a savings account, or use a checkbook, and that he had no money other than what she gave to him.  *Id.*  She further noted that she paid the bills and opined that he would ignore the bills or perhaps pay late if he were to be in charge of them.  *Id.*

In terms of his abilities, his mother marked that his condition impacted his ability to walk, his ability to talk, his memory, his concentration, and his ability to get along with others.  AR 300.  She further opined that Plaintiff could not handle stress "at all" and that one or two daily events seem to exhaust him, causing him to retreat and rest for the rest of the day.  AR 301.  In her closing remarks, she wrote that Plaintiff had extremely refractive major depression and that none of his treatments, including his anti-depressant medication, anti-anxiety medication, or psychiatric treatment, have helped his condition.  AR 302.  She noted that nothing worked for Plaintiff and that his depression seems to have gotten worse as he gets older.  *Id.*

### D.    Documentary Medical Evidence

Plaintiff's medical records include treatment for physical ailments but the Court will limit the overview here to his mental health treatment as Plaintiff does not challenge the ALJ's treatment of the physical impairments in this case.  *See* ECF No. 18; ECF No. 19 at 3 n.3.

### i.    Treatment and hospitalizations from 2013-2014

Plaintiff was diagnosed with depression at the age of 16 (AR 559),[1] but the earliest

---

[1] Plaintiff testified that he was diagnosed at age 15, but the Court does not find this

treatment notes in the record are from August 26, 2013, where Plaintiff met with Dr. Sabah Chammas. AR 503. Plaintiff reported feeling very depressed and that he stopped taking his medication. *Id.* He also reported having death wishes and suicidal impulses, although he denied any suicidal intent or plan. *Id.* Plaintiff agreed to be admitted. *Id.* In his Mental Status Examination ("MSE"), Dr. Chammas reported that Plaintiff did not exhibit any signs of psychosis or mania, his appearance was appropriate, and he was oriented to person, place, time and situation. AR 504. He described Plaintiff's behavior, psychomotor behaviors, and thought content as unremarkable. *Id.* He also noted Plaintiff's speech was clear, his affect was appropriate, his mood was anxious and depressed, his memory was intact, his sensorium was clear and consciousness, his intelligence was average, and his attitude was cooperative. *Id.* Plaintiff's attention, reasoning, impulse control, judgment, and insight were described as good, and his self-perception was noted as realistic. *Id.* Finally, Plaintiff's thought process was described as logical and his GAF score was 55. *Id.* Plaintiff's MSEs would remain the same throughout his latter appointments with Dr. Chammas. *See e.g.* AR 457, 460, 464.

On the same day, August 26, 2013, Plaintiff was admitted to Sharp Mesa Vista Hospital, where he began receiving ECT treatment. AR 384, 366, 398. On admission, Plaintiff's MSE showed psychomotor retardation, soft speech, depressed and anxious mood, coherent and logical thought process, no obsessions, compulsions, or delusions, no suicidal or homicidal ideation, poor attention, poor memory, good insight, judgment, and impulse control. AR 378. His GAF score was 25-30. *Id.*

On August 27, 2013, Plaintiff told treating sources to "[d]o whatever you feel is necessary. I don't care anymore." AR 384. Treating sources described him as having poor energy and having passive suicidal thoughts, although he had no plan or intent to harm himself. *Id.* He was further described as demoralized and despondent, and his GAF was 25-30. *Id.* Treating sources also noted that he had intermittent symptoms of

discrepancy to be significant.

not being able to catch his breath which seemed to be related to anxiety.  AR 383.  On August 28, 2013, Plaintiff received his first ECT treatment.  AR 400.  Dr. Fadi Nicolas wrote that Plaintiff reported having some headaches and muscle aches, but for the most par, he was tolerating the procedure fairly.  *Id.*  Plaintiff's MSE was similar to his MSE upon admission, except his hygiene and grooming were described as good, his mood was described as depressed, his affect was noted as being appropriate to mood, and he was reported to be oriented in time, space, and location.  AR 400-01.  On August 29, 2013, Dr. Nicolas reported that Plaintiff was having some memory problems after his first ECT treatment.  AR 398.  Specifically, Dr. Nicolas wrote that Plaintiff did not remember seeing him the day before and stated that he had not seen Dr. Nicholas in four days.  *Id.*  Plaintiff's MSE remained the same.  *Id.*

On August 30, 2013, Plaintiff received his second ECT treatment.  AR 396.  He reported not much improvement in his mood and that he was still struggling with anxiety.  *Id.*  His MSE was largely the same as his previous, except that his affect was described as constricted.  *Id.*  On August 31, 2013, Plaintiff was discharged.  AR 378.  Dr. Susan Harvey wrote that he did not have a noticeable change in his mood, but he was noted to be slightly more interactive with a slightly brighter affect in his interaction with staff and peers.  AR 379.  She rated his prognosis as "fair to good" with continued engagement in mental health treatment.  *Id.*  His condition was reported as stable and his GAF upon discharge was 45.  *Id.*

Plaintiff continued with ECT treatments.  On October 3, 2013, after Plaintiff's 11th ECT treatment, Dr. Harvey noted that Plaintiff's mood was fairly stable, but he had decreased mood with an increase time between treatments.  AR 363, 375.  On October 14, after Plaintiff's 13th ECT treatment, Dr. Nicolas noted that Plaintiff was still depressed, but stable and denied suicidal ideations.  AR 371.

Between October 23, 2013, and October 25, 2013, Plaintiff was placed into 5150 psychiatric hospitalization because he texted his friend that he had nothing to live for and that he was giving his stuff away, after Plaintiff was fired from his job.  AR 349.  During

his hospitalization, Plaintiff adamantly denied suicidal ideations and stated that he would fight for his job. AR 349, 354. He also stated that he felt angry, but not hopeless. *Id.* His MSE on October 23, 2013 showed that he had good hygiene, was well-groomed and dressed appropriately, maintained good eye contact, and spoke fluently. *Id.* His mood was described as slightly irritable and his affect was congruent to his mood. *Id.* His thought process was goal directed, logical and linear, he was alert and oriented as to person, time, and place, his memory, attention and concentration appeared to be intact, he was able to recall three out of three on immediate recall and in five minutes, and his judgment and insight were fair. *Id.* On discharge, he was reported as having no suicidal or homicidal ideations, and displaying a bright affect. *Id.*

On November 11, 2013, Dr. Harvey reported that Plaintiff's mood was fairly stable, but with more depression in context of recent life-stressors (i.e. loss of job). AR 361. On November 18, 2013, Plaintiff met with Dr. Chammas, reporting that he was still depressed and often anxious. AR 499. While Plaintiff reported some improvement with ECT treatment, he was not sure that more would help his condition. *Id.* His GAF score rose to 65. AR 500. On November 25, 2013, Dr. Chammas wrote that Plaintiff had compliance issues with his medication. AR 496. Plaintiff's MSE was the same as his previous appointment and his GAF rose to 68. AR 496-97. On December 3, 2013, Plaintiff reported still having depression and anxiety. AR 493. On December 16, 2013, Dr. Chammas noted that Plaintiff remained depressed and withdrawn with poor stress tolerance and poor concentration. AR 489. He further wrote that Plaintiff's symptoms were chronic and lasted for many months. *Id.* Plaintiff's MSE and GAF though remained the same as his previous appointments. AR 489-90.

On January 6, 2014, Plaintiff reported that he was still struggling with anxiety and depression. AR 485. Dr. Chammas wrote that he would increase plaintiff's current medication. *Id.* Plaintiffs' MSE and GAF remained the same. AR 485-86. On February 10, 2014, Plaintiff again reported struggling with depression and anxiety. AR 482. He did not feel that his current medication was helping and, in fact, felt worse with it at

times. *Id.* Plaintiffs' MSE stayed the same while his GAF score dropped to 65. AR 482-83. On February 24, 2014, Plaintiff reported that he stopped taking medication, because it made his appetite worse, and stated that he felt more depressed. AR 478. His MSE and GAF remained the same as his previous appointment. AR 478-79. On March 10, 2014, Plaintiff reported no significant change on his new medication. AR 474. His MSE and GAF remained the same as his previous appointments. AR 474-5.

On March 27, 2014, Plaintiff reported he ran out of medication due to money, but also stated that he felt somewhat better and was thinking about going back to work. AR 471. Plaintiff's MSE remained the same, while his GAF score rose to 70. AR 471-72. On April 21, 2014, Plaintiff reported that he continued to struggle with his depression and that he was not taking his medication because the higher doses were too expensive. AR 468. His MSE and GAF were the same as his previous appointment. AR 468-69. On May 12, 2014, Plaintiff stated that he had difficulty with depression and anxiety since his last visit and had been off his medication for weeks due to finances. AR 464. His MSE was the same, while his GAF dropped to 65. AR 464, 466. On May 27, 2014, Dr. Chammas wrote that Plaintiff was still not taking his medication and did not call the clinic to see if he could get his medication for free. AR 460. Dr. Chammas also noted that he had to educate Plaintiff on complying with his treatment and following through on recommendations. *Id.* Plaintiff's MSE and GAF were the same as his previous appointment. AR 460-61.

Finally, on his August 26, 2014 appointment, Plaintiff's treatment with Dr. Chammas was terminated. AR 458. Dr. Chammas wrote that Plaintiff did not show up to his job and also had not kept appointments with Dr. Chammas. *Id.* Dr. Chammas further noted that Plaintiff had not been following through with his treatment recommendations. *Id.* While Plaintiff reported that he could not afford his medication, Dr. Chammas questioned this assertion, noting that Plaintiff was able to get his mother to pay for many of his items, some of which were not essential. *Id.* Dr. Chammas referred Plaintiff to the clinic as his only option. *Id.* Plaintiff's MSE and GAF did not change

since his last appointment.  AR 457-58.

## ii.  Camellia Clark

On July 21, 2015, Dr. Camellia Clark performed a psychiatric evaluation of Plaintiff.  AR 582.  In her MSE she noted that Plaintiff was neatly dressed and groomed and his posture and gait were within normal range.  AR 583.  She also wrote that Plaintiff's mannerisms appeared very down cast, his social interaction with her was not normal, his psychomotor activity was remarkable for psychomotor retardation, and he had poor eye contact.  *Id.*  In terms of his orientation, attention, and memory, Dr. Clark noted that Plaintiff was oriented to the month, date, year, and the city of the evaluation, was able to complete serial threes with speed and accuracy, and was able to spell his name backwards correctly.  *Id.*  She further wrote that Plaintiff was not easily distracted and did not need structure from her during the evaluation.  *Id.*  She rated his memory as adequate for autobiographical information and noted that he was able to recall three out of three items after five minutes.  *Id.*  In terms of his abstractions and judgment, she noted that his abstraction was concrete for similarities and abstract for proverbs, and his insight and judgment were intact.  *Id.*  In terms of affective status, she wrote that Plaintiff described his mood as "wish I was gone," and his affect was observed as being very depressed.  She further noted that she observed evidence of severe depression manifested by psychomotor retardation and evidence of moderate anxiety.  *Id.*  She wrote that Plaintiff had passive suicidal ideations with no intention or plan.  *Id.*  In terms of Plaintiff's reality contact, she noted that Plaintiff's thought processes were logical and goal directed.  *Id.*

In her evaluation of Plaintiff's level of functioning she noted that he was able to take care of his personal hygiene, knew how to take care of all chores necessary to live independently, and was able to drive and handle his own finances.  AR 584.  She also noted that Plaintiff reported that he was unable to cook and shop because of poor motivation and energy.  *Id.*  In her diagnostic impression she wrote that Plaintiff's GAF was 53, and in her medical source statement she wrote that Plaintiff had moderate

limitation in ability to socially interact with others at an age-appropriate level, no limitations in ability to understand instructions, moderate limitations in ability to sustain an ordinary routine without sustained supervision, noting that he would have difficulty attending work regularly and has in the past, no limitation in ability to complete simple tasks, no limitation in ability to complete complex tasks, moderate limitation in ability to concentrate for at least two-hour increments at a time, in order to maintain a regular work schedule, noting that he would have difficulty concentrating for two hours at a time, no limitations in ability to avoid normal hazards, and was capable of handling funds. *Id.*

### iii.   Gregory Paniccia- Treating Physician
#### a.  Treatment Notes

Dr. Paniccia saw Plaintiff routinely for approximately 1.5 years, starting around November 11, 2015.  AR 719.  At this appointment, he wrote that Plaintiff's current bout of depression began on Fall 2013.  *Id.*  He also noted that Plaintiff had passive suicidal ideations that life was not worth living and wished death, but Plaintiff had no active suicidal ideations.  *Id.*  On Plaintiff's MSE, Dr. Paniccia wrote that Plaintiff's grooming was neat and casual, his clothes were clean, his eye contact was good/consistent, his behavior was cooperative, and his psychomotor activities and speech were normal.  *Id.* He noted Plaintiff's mood was depressed, his affect was consistent with his mood, and facial expression suggested sadness and depression.  *Id.*  He described Plaintiff's thought process as logical/coherent and normal, his insight and judgment as normal for his age, and his intellectual functioning as normal.  *Id.*  In terms of Plaintiff's memory, mental capacity, attention, and concentration, he noted impaired recall memory, difficulty concentration, memory problems (immediate, recent, remote), but also wrote that Plaintiff was able to maintain/hold/attend to conversation, and he was oriented as to person, time, and place, and was alert.  *Id.*  Plaintiff's MSE would remain largely the same throughout his meetings with Dr Paniccia.  *See e.g.* AR 700, 709, 713.  He also reported Plaintiff's GAF was 49, indicating serious symptoms or serious impairment in social, occupational, or school functioning.  AR 720.  He further noted that Plaintiff's

11

coping skills were good, and his prognosis was fair. *Id.*

On December 15, 2015, Plaintiff reported only a possible slight improvement. AR 716. In terms of symptoms, Dr. Paniccia also wrote that Plaintiff had sadness, had anhedonia, felt hopeless, was unmotivated, had hypersomnia, had anorexia, lacked energy, felt guilty, felt worthless, and felt indecisive. *Id.*

On January 1, 2016, Plaintiff stated that he was on his medication for 21 days but was unable to continue because the pharmacy would not honor his voucher. AR 713. Like the previous appointment, he only reported slight improvement on his medication, and noted the same symptoms. AR 713. Dr. Paniccia discontinued his medication at the time and placed him on new medication. AR 714.

Plaintiff missed his appointment on February 23, 2016. AR 712. But at his next appointment on March 22, 2016, Plaintiff reported that his prescription ran out after three weeks because he missed his last appointment. AR 709. He reported feeling somewhat out of control in terms of his life, and felt his life was being dictated by his depression. *Id.* He also questioned the efficacy of his present medication. *Id.* Dr. Paniccia also noted the same symptoms as his previous appointment. *Id.* Dr. Paniccia discontinued Plaintiff's medication again and placed him on a new medication. AR 710.

Plaintiff seemed to miss his April 26, 2016 appointment (AR 708) but met with Dr. Paniccia at his May 10, 2016 appointment. AR 705. Plaintiff reported that he did not notice anything in terms of efficacy or side-effects for his new medication. *Id.* He also felt overwhelmed from his depression, due to being unable to function because of the depression, and felt that his life was being dictated by his depression. *Id.* Dr. Paniccia also noted the same symptoms as his previous appointments. *Id.* Plaintiff's MSE and GAF were largely the same except for a change in his grooming to "unshaven." AR 705-06. Plaintiff's dose of his medication was increased. *Id.*

On Plaintiff's May 24, 2016 appointment, he reported some slight improvement on his increased dosage. AR 703. He felt less overwhelmed and hopeless from his depression, but Dr. Paniccia also noted the same symptoms as his previous appointments.

*Id.* On June 7, 2016, Plaintiff stated that he noticed some improvement, joked around with his mother and felt slightly less overwhelmed and hopeless from his depression.  AR 700.  On July 19, 2016, Plaintiff reported that he did not notice any negative changes.  AR 801.  Dr. Paniccia lowered plaintiff's dose of his medication at the time and added another medication to his regimen.  *Id.*

On August 30, 2016, Plaintiff stated that the new medication helped his overall mental health.  AR 799.  He reported waking up before the alarm clock, that his mood was brighter, having more energy, and being more productive in terms of chores.  *Id.* Plaintiff claimed that he felt the best he felt in about 15 years.  *Id.*  Dr. Paniccia increased the dose of Plaintiff's new medication.  AR 800.

On September 27, 2016, Plaintiff reported that the increase in his new medication did not help his condition and that his mother thought he was violent and angry on the new medication.  AR 796.  While Plaintiff reported that he was still waking up before his alarm clock, Dr. Paniccia noted that Plaintiff's mood was not brighter now, he did not have more energy now, and that he was not more productive in terms of chores now.  *Id.* Dr. Paniccia increased the dose of Plaintiff's new medication.  AR 797.

On October 25, 2016, Plaintiff stated that he still did not feel that the increase in the dosage of his new medication helped.  AR 793.  Dr. Paniccia also reported that his mood was not brighter now, he did not have more energy now, he was not more productive in terms of chores now, and he is now not eating.  *Id.*  Dr. Paniccia again increased the dose of Plaintiff's new medication.  AR 794.

On November 29, 2016, Plaintiff reported that the increased dosage did not help his overall mental health.  AR 790.  Plaintiff stopped both medications he was on the week before his appointment and felt worse in terms of his symptoms.  *Id.*  He reported that Plaintiff did not wake up before his alarm clock, he was sleeping more, his mood was not brighter now, he did not have increase energy, he was experiencing anhedonia, was not more productive in terms of chores, and was not eating.  *Id.*  Dr. Paniccia discontinued Plaintiff's new medication and added another medication.  AR 791.

13

On February 14, 2017, Plaintiff reported no change on the new medication and having anorexia for several weeks, noting that the idea of eating was disgusting to him. AR 787. Dr. Paniccia wrote that Plaintiff was still not up before the alarm clock, his mood was not brighter, he had no change in energy now, he had anhedonia, and he was not more productive in terms of chores, but still does the essentials. *Id.* Dr. Paniccia discontinued Plaintiff's most recent medication and added a new medication. AR 788.

On March 31, 2017, Plaintiff reported being depressed and having no change on his new medication. AR 784. He was still not eating and still felt that the idea of eating was disgusting to him. *Id.* Dr. Paniccia reported that his mood was not brighter now, he had no change in energy, he was very tired, had anhedonia, and was not more productive in chores, but does the essentials. *Id.* Dr. Paniccia discontinued Plaintiff's most recent medication and added a new medication. AR 785.

On April 25, 2017, Plaintiff still reported he was depressed. He was unable to try the new medication because it was not covered. AR 781. Plaintiff's symptoms, MSE, and GAF were the same as his previous appointment. AR 781-82. On May 30, 2017, Plaintiff reported that he was still unable to try the new medication, because the pharmacy did not process information sent by Dr. Paniccia. *Id.* Plaintiff still reported feeling depressed and having the same symptoms as his previous appointments. AR 778.

On June 27. 2017, Plaintiff reported no change. His symptoms, MSE, and GAF were largely the same as his previous appointment, except for a change in the description of his mood to "depressed and low energy," and his facial expression to "sadness and depression. Fatigue." AR 775-76. On July 11, 2017, Plaintiff reported not having much change on his new medication. AR 772. Dr. Paniccia wrote that Plaintiff was still not awake before his alarm, his mood was not brighter, and he experienced anhedonia, but also noted there was a slight change in his energy, he was a bit more productive, and less tired. *Id.*

Finally, on August 9, 2017, Plaintiff reported not much change on his new medication. AR 769. Plaintiff also stated he was off of his medication for 1.5 weeks

because the pharmacy did not notify Dr. Paniccia that a new treatment authorization request form was needed.  *Id.*  Dr. Paniccia wrote that Plaintiff was not up before the alarm clock, he had missed several appointments, his mood was not brighter, he had no change in energy and he was not more productive.  *Id.*  Plaintiff's MSE and GAF were largely the same, except that his mood was described as anxious and depressed, and his facial expression was described as showing anxiety, sadness, and depression.  AR 769-70.

### b. Medical Opinions

On February 9, 2015, Dr. Paniccia completed an initial psychiatric review of Plaintiff's mental impairment.  AR 544.  He rated Plaintiff's GAF at 49 and noted that Plaintiff would have difficulty working at a regular job on a sustained basis because his depression was so severe that he could not even get out of bed to go to work.  AR 546.  In terms of work-related activities, Dr. Paniccia found a mild limitation in Plaintiff's ability to understand, remember, and carry out simple one or two-step job instructions.  *Id.*  He also found moderate limitations in Plaintiff's ability to 1) perform detailed and complex instructions, 2) relate and interact with co-workers and the public, and 3) accept instructions from supervisors.  Finally, he found marked limitations in Plaintiff's ability to 1) maintain concentration and attention, persistence, and pace, 2) maintain regular attendance in the workplace and perform work activities on a consistent basis, and 3) perform work activities without special or additional supervision.  AR 547.  In terms of functional limitations, Dr. Paniccia noted that Plaintiff had marked restrictions of activities of daily living, marked difficulties in maintaining social functions, and extreme difficulties in maintaining concentration, persistence, or pace.  *Id.*  He further noted that Plaintiff had 4 or more episodes of decompensation, each of extended duration.  *Id.*  Finally, Dr. Paniccia emphasized that Plaintiff's depression had been treatment refractory and he had failed 14 medications already.  AR 548.

On August 30, 2016, Dr. Paniccia filled out a second psychiatric review of Plaintiff's mental impairment.  AR 656, 660.  Plaintiff's GAF was 49.  AR 656.  Dr.

Paniccia wrote that Plaintiff had failed roughly 15 medications and that his prognosis was fair to guarded.  AR 657.  He further opined that he anticipated Plaintiff would be absent from work more than 3 times a month because of his impairment, noting that Plaintiff can barely get out of bed and make it to doctor's appointments.  AR 658.  He also indicated that Plaintiff would be off task more than 20% (over 12 minutes an hour) due to his impairment, writing that Plaintiff had poor focus/ concentration/ memory, distractibility, anxiety, sadness, and anhedonia.  AR 658.  Dr. Paniccia's findings in terms of Plaintiff's work-related activities were largely the same as his previous review.  *Compare* AR 547-48 *with* AR 657-58.  He found a mild limitation in Plaintiff's ability to understand, remember, and carry out simple one or two-step job instructions.  AR 659.  He also found moderate impairments in Plaintiff's ability to perform detailed and complex instructions, and to accept instructions from supervisors.  *Id.*  Finally, he found marked impairments in Plaintiff's ability to 1) relate and interact with co-workers and the public, 2) maintain regular attendance in the workplace and perform work activities on a consistent basis, and 3) perform work activities without special or additional supervision.  *Id.*  Dr. Paniccia's assessment of Plaintiff's functional limitations were also largely consistent with his previous review, noting that Plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace.  *Id.*  Finally, he wrote that Plaintiff was permanently disabled by major depression, which had been refractory to medication for years.  AR 660.

On July 11, 2017, Dr. Paniccia filled out a third psychiatric review.  AR 663.  In this review, he wrote that Plaintiff had not experienced a remission of depression despite trying medication monotherapy and combination therapy with at least 18 different agents. *Id.*  In his evaluation of Plaintiff's mental disorder functional limitations, he checked marked limitations in Plaintiff's ability to 1) understand, remember and apply information, 2) interact with others, 3) concentrate, persist or maintain pace, and 4) adapt or manage oneself.  AR 664-65.  He again opined that he anticipated plaintiff to be absent

from work more than three times a month, because he could not get out of bed on a consistent basis.  AR 666.  He further noted that Plaintiff would miss more than 20% of an 8-hour workday due to his poor focus, concentration, memory, and attention span, which severely limited executive functioning and overall work performance.  *Id.*  Finally, Dr. Paniccia wrote that Plaintiff was permanently disabled by major depression.  AR 667.

### iv.    Dr. Monica Arango

The record shows that Plaintiff met with Dr. Arango several times between November 2016 and March 2017, while he was being treated by Dr. Paniccia.  AR 729, 740, 756.  On Plaintiff's November 7, 2016 appointment, Dr. Arango wrote that Plaintiff seemed to be struggling with "what appeared to be treatment resistant depression," which affected all aspects of his functioning, including his motivations, hopefulness, and ability to engage and complete tasks.  AR 757.  Dr. Arango further noted that he scored on the severe range for both anxiety and depression in self-report measures for the past two weeks, and had a difficult time finding motivation and concentration to complete tasks that required several steps.  *Id.*  In Plaintiff's MSE, Dr Arango noted that his appearance and behavior was calm, cooperative, good eye contact, casual dress, with no abnormal movements.  His speech was normal, mood was euthymic, judgment and insight were fair, and affect was congruent to mood.  His thought process was alert and oriented, linear and goal directed, with no tangential thought, no circumstantial thought, and no disorganization.  He did not have suicidal or homicidal ideations, auditory or visual hallucinations, and delusions.  AR 756.

Plaintiff met with Dr. Arango again on November 15, 2016, where he endorsed symptoms of severe depression and anxiety for the previous two weeks.  AR 741.  He reported that his present medication was not working and that he had been feeling frustrated because he had tried various medications and treatments over the years with little success.  *Id.*  His MSE remained the same as his previous appointment.  AR 740.  Finally, Plaintiff met with Dr. Arango on March 20, 2017, where he continued to endorse symptoms of severe depression and anxiety.  AR 730.  Plaintiff further reported that he

developed a dislike of food and drastically limited his food intake.  *Id.*  Plaintiff's MSE

remained the same as his previous appointments.  AR 729.

### v.     State examining physicians

State Examining Physician's, Dr. Amado and Dr. Naiman, completed their

Disability Determination for Plaintiff's Title II and Title XVI claim on August 4, 2015.

AR 83-101, 102-120.  In his summary of the psychiatric evidence, Dr. Amado noted Dr.

Paniccia's February 2015 review was not congruent with the treating psychiatric record

which showed normal MSEs.  AR 91.  He characterized Dr. Paniccia's opinion as an

"advocacy instrument" largely dependent on claimant's narrative and subjective reports

and was not accompanied by progress notes.  *Id.*  He further noted that the treatment

notes of previous psychiatric providers contrasted with Dr. Paniccia's opinion, showing

Plaintiff to be clinically stable with benign MSEs and high GAF scores through October

2014.  *Id.*  In his second psychological summary, Dr. Amado found that Plaintiff had a

moderate ability to socially interact with others at age appropriate levels as well as

sustain an ordinary routine without supervision, and the ability to concentrate for at least

2 hour increments at a time in order to maintain a regular work schedule.  *Id.*  He further

noted that Plaintiff was able to handle his own funds.  *Id.*

Under the B criteria, Dr. Amado opined that Plaintiff had 1) moderate restrictions

of activities of daily living, 2) moderate difficulties in maintaining social functioning, 3)

moderate difficulties in maintaining concentration, persistence or pace, and 4) no

repeated episodes of decompensation, each of extended duration.  AR 93.  In his

explanation of his conclusion, Dr. Amado wrote that Plaintiff presents with chronic early-

onset mood disturbance with periods of episodic de-compensation requiring hospital

admission, albeit not within the past year.  *Id.*  He also noted a contrast between the

medical evidence record on file, showing good response to treatment, normal MSE

findings recorded across multiple visits, and Dr. Paniccia's opinion.  *Id.*

To resolve this conflict, Plaintiff was scheduled for an independent psychiatric

evaluation on July 2015.  *Id.*  At this evaluation, Plaintiff's adherence to prescribed

medication seemed compromised, because he had run out six weeks prior and made no attempt to refill. *Id.* At the evaluation, Plaintiff's MSE was remarkable for downcast demeanor and poor eye contact, psychomotor slowing, very depressed affect with suicidal ideation but no imminent plans. *Id.* He was reported as having no overt psychosis, and cognitions were grossly intact. *Id.* The examiner extended moderate limitations across a number of domains, but Dr. Amado concluded that entry-level simple repetitive task work activity is not precluded, within the constraints of the medical evidence of record. *Id.*

On Plaintiff's Mental RFC, Dr. Naiman opined that there were no significant limitations in Plaintiff's ability to remember locations and work-like procedures, and remember very short and simple instructions. AR 97. He also noted moderate limitations in Plaintiff's ability to understand and remember detailed instructions. AR 98.

In terms of Plaintiffs concentration, Dr. Naiman wrote that Plaintiff had no significant limitations in his ability to carry out very short and simple instructions, and make simple work-related decisions. *Id.* He also noted moderate limitations in Plaintiff's ability to 1) carry out detailed instructions, 2) maintain attention and concentration for extended periods, 3) perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances, 4) sustain an ordinary routine without special supervision, 5) work in coordination with or in proximity to other without being distracted by them, and 6) complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

In terms of social interaction, Dr. Naiman opined that Plaintiff had no significant limitation in his ability to ask simple questions and request assistance and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. AR 98-99. He also noted moderate limitations in Plaintiff's ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. AR 99.

Finally, regarding Plaintiff's adaptation limitations, Dr. Naiman noted Plaintiff was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions. AR 99. He further noted that Plaintiff was moderately limited in his ability to 1) respond appropriately to change in the work setting, 2) travel in unfamiliar places or use public transportation, and 3) to set realistic goals or make plans independently of others. *Id.* From these findings, Dr. Naiman concluded that Plaintiff was 1) able to learn and retain simple 1-2 step instructions which were clearly explained, 2) could implement simple 1-2 step instructions on a consistent basis, 3) was limited to no more than incidental contact with the general public and no intense or prolonger interactions with prospective coworkers and supervisors, and 4) was able to adapt to minimal change in the work setting. AR 98-99. Dr. Naiman ultimately opined that Plaintiff was not disabled. AR 100.

On December 23, 2015, Dr. Funkenstein completed his reconsideration of the August 4, 2015 disability determination. AR 123-40, 141-58. Upon reconsideration, Plaintiff noted that he lacked hope that things will be okay and that causes a decrease in his desire to do things (AR 124), but Dr. Funkenstein reached the same conclusions and findings as Drs. Amado and Naiman. AR 129-40.

### vi.   Dr. Kathy Vandenburgh- Examining Physician

On October 30, 2017, Plaintiff met with Dr. Vandenburgh for a psychological evaluation per the ALJ's orders. AR 69, 880. In her general observations, Dr. Vandenburgh noted that Plaintiff was able to relate in a pleasant and cooperative manner. AR 881. Regarding Plaintiff's level of functioning, Dr. Vandenburgh wrote that Plaintiff was able to bathe and dress independently, wash dishes, vacuum, sweep, heat up simple foods on the stove and in the microwave, shop for groceries, and perform yardwork. AR 883. She further wrote that Plaintiff could drive and manage funds. *Id.*

Dr. Vandenburgh wrote that Plaintiff's typical day consisted of waking up in the morning, going on the computer to hear the news, watching TV and helping his mother with chores. *Id.* She further noted that Plaintiff tried to help his mother with as many

20

tasks as he can. *Id.* Plaintiff would also go through the mail, make appointments, eat, watch TV with his mother, and do grocery shopping if needed.  *Id.*  Then he would go into the garage, care for the stray cat he adopted, read, and spend time alone.  *Id.*

Dr. Vandenburgh performed an MSE, where she noted that Plaintiff exhibited normal posture, gait, and mannerisms, was generally pleasant, cooperative, alert and appeared to understand simple test questions, exhibited a normal and organized thought process, expressed depressed mood and affect, exhibited the ability to recall personal history with adequate detail, recall complaints about why he could not work, recall personal information about himself, recall three objects, and exhibited the ability to focus on tasks by spelling the word "world" forwards and backwards and could recall six digits forwards and backwards.  AR 883, 886.

Dr. Vandenburgh also performed several tests on Plaintiff to evaluate his mental capabilities.  AR 884, 886.  Based off the results of these tests Dr. Vandenburgh opined that plaintiff was intellectually functioning in the average range.  AR 885.  She further wrote that he completed tasks at an appropriate pace, his overall ability to remember and learn information was in the low average range, and his word reading, spelling, and math computation skills were in the average range.  *Id.*

In her prognostic impression, she opined that based on her interactions with Plaintiff, he exhibited no limitations in his ability to socially interact with others at an age appropriate level, but he could have a mild to moderate impairment at times due to his severe social anxiety, no limitations in his ability to understand instructions, mild limitations in his ability to sustain an ordinary routine without sustained supervision due to symptoms of anxiety and depression, ability to complete simple and detailed tasks, moderate impairment in maintaining employment due to not showing up to work because of his depression, moderate limitations in his ability to complete complex tasks, no limitations in his ability to concentrate for at least two hour increments at a time, but that he may have a mild impairment concentrating for longer periods of time, no limitations in his ability to avoid normal hazards as long as he continues with mental health treatment,

1   and that he was capable of handling funds.  AR 885, 887.

2               **E.**     **Vocational Expert's Testimony**

3       VE Alan L. Ey testified at the hearing.  AR 73.  He characterized Plaintiff's

4 vocational background into two occupations: 1) stock clerk, 299.367-014, with a Specific

5 Vocational Preparation ("SVP") of 4 and listed as a heavy exertional occupation, but

6 performed as a medium exertional occupation, and 2) manager, department, 299.137-010,

7 with an SVP of 7 and listed as a medium exertional occupation.  AR 73-74.

8       The ALJ then posed this first hypothetical to the VE, asking whether an individual

9 with Plaintiff's age, education, and work experience, and who was capable of performing

10 a full range or work at all exertional levels could perform Plaintiff's past work given the

11 following restrictions: he can carry out only unskilled tasks at all appropriate reasoning

12 levels per the DOT and can perform those tasks at an adequate pace for an eight hour

13 work day with normal breaks; he could occasionally interact with coworkers and

14 supervisors but should have no contact with the general public and can tolerate only

15 occasional changes in the work setting.  AR 74.  The VE testified that such an individual

16 would not be able to perform the aforementioned occupations.  *Id.*

17       The ALJ then asked if the VE could identify any other work that could fit the

18 aforementioned description, the VE testified that there would be three jobs that would fit

19 the requirements: (1) cleaner II, 919.687-014, with national numbers of 35,000; (2) gas

20 an oil servicer, 915.587-010, with national numbers of 27,000; and (3) cleaner, laboratory

21 equipment, 381.687-022, with national numbers of 50,000.  AR 74-75.

22       The ALJ then added additional physical restrictions: he can only lift or carry 20

23 pounds occasionally and ten pounds frequently, can sit six hours and stand and/or walk

24 six hours in a normal eight hour day; He is unlimited in pushing or pulling other than as

25 shown for lifting and carrying, can occasionally perform all postural, must avoid

26 concentrated exposure to fumes, dusts, odors and other pulmonary irritants.  AR 75, 77.

27 The VE responded that there would be three jobs that would fit the these new restrictions:

28 (1) assembler of small products, 706.684-022, with national numbers of 23,000; (2)

assembler of electrical accessories, 729.687-010, with national numbers of 21,000; and (3) inspector and hand packager, 559.687-074, with national numbers of 26,000

The ALJ presented the VE with another hypothetical, adding in the additional constraint that Plaintiff would be off tasks for more than 12 percent of a work schedule. AR 78. The VE testified that it would completely eliminate his employability. *Id.* The ALJ then asked what Plaintiff's employability would be if he missed three or more days of work. *Id.* The VE testified that employment could not be sustained. *Id.*

The ALJ then asked how did the VE determine Plaintiff's employability based on the last two hypotheticals. *Id.* The VE responded that his answers were based off of his opinion of what was generally reasonable and not reasonable in the labor market. *Id.* The VE testified that his opinion was formed from his experiences having work, returning people to work for many years, and having met with various managers and HR professionals. *Id.*

## II.   THE ALJ DECISION

### A.   The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months. 42 U.S.C. §§ 423(d), 1382c(a)(3). The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b). If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(c). If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R.

23

1  Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(d).  If the

2  applicant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

3        If the impairment does not meet or equal a listing, the ALJ must determine the

4  applicant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4)(iv),

5  416.920(e). Then, the ALJ must determine at step four whether the applicant retains the

6  residual functional capacity to perform past relevant work.  *Id.* §§ 404.1520(a)(4)(iv),

7  416.920(f).  If the applicant cannot perform past relevant work, at step five the ALJ must

8  consider whether the applicant can perform any other work that exists in the national

9  economy.  *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

10        The applicant carries the burden to prove eligibility from steps one through four

11  but the burden at step five is on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th

12  Cir. 2003).  Applicants not disqualified at step five are eligible for disability benefits.  *Id.*

13                **B.    Substance of the ALJ's Decision**

14        At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity

15  since July 14, 2014, the alleged onset date.  AR 23.

16        At step two, the ALJ determined Plaintiff's major depressive disorder and

17  cognitive disorder constituted severe impairments.  *Id.*  In addition, the ALJ determined

18  that Plaintiff's Barret's esophagus, GERD, umbilical hernia, asthma, right hand

19  dupuytren's contracture, costochondritis, hyperlipedemia, marijuana abuse, and history of

20  syncope did not more than minimally limit Plaintiff and were non-severe impairments.

21  *Id*.

22        At step three, the ALJ found Plaintiff did not have an impairment or combination

23  of impairments that would meet or medically equal the severity of any listed

24  impairments.  AR 23-24.  The ALJ considered Paragraph B criteria in evaluating the

25  severity of Plaintiff's mental impairment and found that Plaintiff did not exhibit the

26  requisite one extreme or two marked limitations.  AR 24.  Specifically, the ALJ found

27  only: a moderate limitation in understanding, remembering, or applying information; a

28  moderate limitation in interacting with others; a moderate limitation in concentrating,

persisting, or maintaining pace; a moderate limitation in adapting or managing himself.
*Id.*  In addition, the ALJ considered Paragraph C criteria and found that Plaintiff did not
have only marginal adjustment.  *Id.*

The ALJ next established that Plaintiff retained the residual functional capacity to
perform the full range of work at all exertional levels, but with the following
nonexertional limitations: the claimant can carry out unskilled tasks at all appropriate
reasoning levels per the DOT; and can perform these tasks at an adequate pace for an
eight-hour workday with normal breaks. He can occasionally interact with co-workers
and supervisors, but should have no contact with the general public; and he can tolerate
only occasional changes in the work setting.  AR 25.

With these limitations, at step four, the ALJ determined Plaintiff could not perform
any of his past relevant work.  AR 29.  However, the ALJ found that based off of the
vocational expert's testimony, there were significant jobs in the economy that Plaintiff
could perform.  AR 29-30.  The ALJ concluded Plaintiff was not under a disability as
defined in the Social Security Act from July 14, 2014, the alleged disability onset date,
through March 2, 2018, the date of the decision.  AR 30-31.

### III.    Legal Standard of Review

The Social Security Act provides for judicial review of a final agency decision
denying a claim for disability benefits.  42 U.S.C. § 405(g).  A reviewing court must
affirm the denial of benefits if the agency's decision is supported by substantial evidence
and applies the correct legal standards.  *Batson*, 359 F.3d at 1193.  "Substantial evidence
means such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion."  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and
citation omitted).  It is a "highly deferential" standard of review.  *Valentine v. Astrue*, 574
F.3d 685, 690 (9th Cir. 2009).  "The ALJ is responsible for determining credibility,
resolving conflicts in medical testimony, and for resolving ambiguities."  *Vasquez v.
Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If
the evidence is susceptible to more than one reasonable interpretation, the agency's

decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.

## IV.    DISCUSSION

In Plaintiff's motion for summary judgment, he presents several arguments as to why the ALJ erred and should not have denied him benefits.  The Court will address each of these in turn.

### A.    Plaintiff's Anxiety

Plaintiff argue that the ALJ erred by failing to consider his anxiety in making the disability determination.  ECF No. 18-1 at 11-13.  Specifically, Plaintiff argues that his anxiety is mentioned throughout the administrative record, but the ALJ fails to mention it at all in the decision.  *Id.* at 11-12.  Plaintiff argues that this is not harmless error because the anxiety significantly interferes with his ability to perform basic work, making it a severe impairment.  *Id.* at 13.  Defendant counters that the ALJ's failure to specifically find anxiety to be a severe impairment is harmless error.  ECF No. 19-1 at 3.

In *Lewis v. Astrue*, the Ninth Circuit found that the failure of the ALJ to mention the plaintiff's bursitis was harmless error because even though it was not mentioned at step two, it was discussed in the step four analysis and thus, the ALJ did take it into account in determining the limitations imposed.  498 F.3d 909, 911 (9th Cir. 2007).  Similarly, in *Burch v. Barnhart*, the Ninth Circuit found harmless error where the ALJ failed to discuss the plaintiff's obesity at step 2 but the ALJ did adequately consider obesity in his RFC determination and thus, there were no functional limitations as a result of the obesity that the ALJ failed to consider.  400 F.3d 676, 682 (9th Cir. 2005).  By contrast, courts find reversible error where the failed mention of the impairment was coupled with no consideration of the impairment at further steps in the process and may have affected the ALJ's RFC assessment.  *See, e.g.*, *McMahon v. Astrue*, No. SACV 10-00475-MAN, 2011 WL 2221181, at *4 (C.D. Cal. June 6, 2011); *Stansbury v. Astrue*, No. 10-CV-05767 BHS JRC, 2012 WL 368029, at *5 (W.D. Wash. Jan. 3, 2012), report

and recommendation adopted, No. C10-5767BHS, 2012 WL 368031 (W.D. Wash. Feb. 3, 2012); *Kipps v. Comm'r Soc. Sec. Admin.*, No. 6:12-CV-00043-MA, 2013 WL 820206, at *2 (D. Or. Mar. 5, 2013); *Calame v. Colvin*, No. CV-12-02363--DGC, 2013 WL 3716604, at *7 (D. Ariz. July 15, 2013); *Beech v. Colvin*, No. SACV 13-00782-MAN, 2014 WL 2931177, at *4 (C.D. Cal. June 26, 2014).

In the instant case, at step two, the ALJ found that Plaintiff suffered from severe impairments of major depressive disorder and cognitive disorder. AR 23. Thus, the question is whether further down in the analysis, the ALJ sufficiently accounted for any limitations that would have been caused by Plaintiff's anxiety that were not already considered as part of the depression and cognitive disorders. After reviewing the ALJ's opinion along with the medical record, the Court concludes that the failure to explicitly mention anxiety was harmless error.

During his testimony, Plaintiff stated that his anxiety caused him to have clammy hands, sweat, and shakes. AR 59. In addition, Plaintiff stated that he "doesn't want to go out and . . . [doesn't] want to be around people" and feels anxious anytime he needs to be around or speak to another person. *Id.* Plaintiff's medical records also indicate that he complained about not being able to catch his breath as a result of his anxiety, AR 383. A review of the administrative record indicates that Plaintiff's anxiety is typically discussed with his depression. AR 396, 493, 485, 482, 464, 583, 757, 741, 730. In Dr. Vandenbaugh's evaluation, she opined that Plaintiff would have mild to moderate impairment at times due to his severe social anxiety and mild limitations in his ability to sustain an ordinary routine without sustained supervision due to symptoms of anxiety and depression. AR 885.

The medical records suggest that Plaintiff's anxiety was seen as encompassed by his depression and, at times, to be a sign of his depression. Even Dr. Paniccia—whose opinion's Plaintiff argues were not given sufficient weight by the ALJ as will be discussed below—did not mention anxiety separately on any of three medical opinions he gave. *See* AR 544-48 (mentioning only depression); 656-660 (discussing depression but

27

mentioning anxiety as a symptom); 663-667 (mentioning only depression).  In light of the way anxiety was treated in the medical records—essentially as encompassed within the broader impairment of depression—it was not unreasonable for the ALJ to consider it in a similar manner.  The ALJ's discussion in step four of his opinion focused on Plaintiff's "mental disorders" and "mental health impairment."  AR 25.  The ALJ discussed Plaintiff's complaints with depressed mood, fatigue, lack of motivation, irritability, and getting along with others, but contrasted this with his mostly positive appearance at examinations, his ability to follow instructions, his activities, and the effect of medication.  AR 26-28.  Thus, the ALJ appeared to consider Plaintiff's mental health as a whole, not necessarily separating out depression and anxiety.

Moreover, while Plaintiff argues that his anxiety "significantly interferes with his ability to perform basic work activities, making it a severe impairment," he does not identify what additional restrictions should have been placed by the ALJ in determining the RFC.  ECF No. 18-1.  The only physical manifestation in the record of the anxiety is the sweaty hands, sweating, shakes, and inability to catch his breath, but there is nothing that indicates that these physical symptoms were so severe as to cause Plaintiff to be restricted as to what work he could perform and Plaintiff does not identify any.  The other manifestation in the record of the anxiety is with regards to social interaction.  This was considered by the ALJ.  *See* AR 25 (noting issues "getting along with others"); 27 (noting that Plaintiff was able to interact with treatment providers).  The ALJ issued an RFC that limited Plaintiff to occasional interaction with coworkers and supervisors but no contact with the general public and tolerating only occasional changes in the work setting.  AR 25.

Accordingly, whatever error the ALJ may have made with regard to not specifically mentioning anxiety, the error was harmless as the ALJ appropriately considered Plaintiff's mental health impairments generally.  The Court finds that the ALJ did not err on this issue.

//

**B.      Dr. Paniccia's Opinions**

Plaintiff contends that the ALJ did not give proper weight to Dr. Paniccia's opinions.  Plaintiff argues that because Dr. Paniccia was a treating physician, the ALJ must weigh the opinion, giving consideration to the factors enumerated in 20 C.F.R. § 404.1527 (c)(1)-(6).  ECF No. 18-1 at 16.  These factors include: (1) examining relationship; (2) treatment relationship, including length of the treatment relationship, the frequency of examination, and nature and extent of the treatment relationship; (3) supportability with evidence; (4) consistency with record with the whole; (5) specialization; and (6) other factors.  Plaintiff contends that the record shows that the ALJ failed to consider all of these factors, but mostly focuses on arguing that the ALJ did not consider the length and frequency of the relationship and that the ALJ did not mention a February 2015 opinion by Dr. Paniccia.  ECF No. 18-1 at 17-18.  Plaintiff's other arguments are that the ALJ essentially did not adopt Dr. Paniccia's ultimate conclusion that Plaintiff would be absent more than three times a month or off task more than 20% of the workday.  *Id.*

Defendant counters that the ALJ did consider the treating relationship because he referred to Dr. Paniccia as a "treatment provider."  *See* AR 27.  Defendant argues that other factors like supportability and consistency were considered, because the ALJ explains that he gave Dr. Paniccia's opinion little weight because inconsistency with his own treatment notes, Plaintiff's reported activity, and Dr. Vandenbaugh's opinion.  *Id.* Defendant argues that the failure to mention the 2015 report is not reversible error, as it was cited in the opinion and duplicative of his latter reports, which were considered and more probative being later in time.  ECF No. 19-1 at 7-8.

Whether or not the Ninth Circuit requires express factor by factor analysis like Plaintiff contends has been addressed by other courts in this district.  In *Hoffman v. Berryhill*, this court determined that *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017) did not "demand a full-blown written analysis of all the regulatory factors" or even "express factor-by-factor reasoning."  No. 16-CV-1976-JM-AGS, 2017 WL 3641881, at *4 (S.D.

Cal. Aug. 24, 2017), report and recommendation adopted, No. 16CV1976 JM(AGS), 2017 WL 4844545 (S.D. Cal. Sept. 14, 2017).[2]  However it "requires some indication that the ALJ considered them."  *Id.*  Failure to do so "constitutes reversible legal error." *Trevizo*, 871 F.3d at 676; *Clark v. Berryhill*, No. 16-CV-2854-BEN-AGS, 2018 WL 620144, at *3 (S.D. Cal. Jan. 29, 2018), report and recommendation adopted in part, No. 316CV02854BENAGS, 2018 WL 948489 (S.D. Cal. Feb. 20, 2018).

Here, the ALJ does mention that Dr. Paniccia is a "treatment provider," but does not mention anything else regarding the nature of their relationship, including duration and frequency.  Dr. Paniccia did treat Plaintiff regularly for a year and nine months, starting around November 11, 2015 through August 9, 2017.  AR 718.  The treatment was frequent, occurring on about a monthly basis.  *See* AR 716, 713, 712, 709, 708, 705, 703, 700, 801, 799, 796, 793, 790, 787, 784, 781, 775, 769.  Absent any mention, it is difficult for the Court to conclude that there is "some indication" the ALJ considered the nature of the examining and treatment relationship.  Several courts within this district have concluded that failure to mention this information is reversible error.  *See Clark v. Berryhill*, No. 316CV02854BENAGS, 2018 WL 948489, at *2 (S.D. Cal. Feb. 20, 2018) (adopting report and recommendation *Trevizo* was not met where ALJ failed to mention the length of the treating relationship, the frequency of examination, or the nature and extent of the treatment relationship and remanding because "full consideration of the regulatory factors would have changed the ALJ's ultimate decision regarding Plaintiff's ability to work"); *Schuh v. Saul*, No. 18-CV-1398-GPC-AGS, 2019 WL 3413509, at *2 (S.D. Cal. July 29, 2019), report and recommendation adopted, No. 18-CV-1398-GPC-AGS, 2019 WL 4729642 (S.D. Cal. Sept. 27, 2019) (remanding where ALJ did not mention treating physician's specialty or whether opinion related to his specialty); *cf. Seawood v. Berryhill*, No. 19-CV-555-LAB(WVG), 2020 WL 1624377, at *14 (S.D. Cal.

---

[2] *Hoffman* analyzed an earlier version of the *Trevizo* decision, but the relevant language is the same on this issue in both Trevizo opinions.  *Compare Trevizo v. Berryhill*, 862 F.3d 987, 997-98 (9th Cir. 2017), with 871 F.3d at 675-76.

Apr. 2, 2020), report and recommendation adopted, No. 19CV555-LAB (WVG), 2020 WL 2126316 (S.D. Cal. May 5, 2020) (*Trevizo* met where ALJ identified physician as treating physician and mentioned dates and frequency of treatment); *Hoffman*, 2017 WL 3641881, at *4 (Aug. 24, 2017) (finding *Trevizo* met where ALJ mentioned treating physician's "specialty and years-long treatment relationship").

Thus, the weight of the authority suggests this is not simply a harmless error. Instructively, the court in *Clark* initially found the error of not mentioning the treatment relationship to be harmless error on report and recommendation, but the recommendation was not adopted and the district court ultimately concluded that "faulty procedure may lead to substantial error." *Compare Clark v. Berryhill*, No. 316CV02854BENAGS, 2018 WL 948489, at *2 (S.D. Cal. Feb. 20, 2018) *with Clark v. Berryhill*, No. 16-CV-2854-BEN-AGS, 2018 WL 620144, at *4 (S.D. Cal. Jan. 29, 2018), report and recommendation adopted in part, No. 316CV02854BENAGS, 2018 WL 948489 (S.D. Cal. Feb. 20, 2018). Specifically, the district court stated that if the treating doctor's opinion had been carefully considered in light of all the § 404.1527(c)(1)-(6) factors, the work limitations may have resulted in a different vocational hypothetical. *Clarke*, 2018 WL 948489, at *2 (S.D. Cal. Feb. 20, 2018). Thus, the court concluded that "[t]here is little indication that the ALJ considered the regulatory factors and some indication that full consideration of the regulatory factors would have changed the ALJ's ultimate decision regarding Plaintiff's ability to work." *Id.*

Here, Dr. Paniccia opined that Plaintiff would be absent more than three times a month or off task more than 20% of the workday. The ALJ asked the VE specifically what would happen if Plaintiff was off task more than 12% of a work schedule, and the VE stated that it would eliminate Plaintiff's employability. AR 78. Similarly, the ALJ asked what would happen if Plaintiff would miss three or more days, and the VE also responded that Plaintiff could not sustain employment in that instance. *Id.* Thus, like in *Clark*, the Court concludes that the ALJ opinion's lack of indication that the *Trevizo* factors were considered was error and that the error cannot be said to be harmless where,

31

1   as here, evaluation of Dr. Paniccia's opinion in its full context may have lead to a

2   different level of weight being afforded and a different RFC being determined.  The

3   Court finds error on this issue.

4          Having found error, the Court finds that remand is the proper course of action.  The

5   decision whether to remand a matter is within the discretion of the District Court.

6   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a

7   court reverses an administrative agency determination, the proper course is to remand to

8   the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882,

9   886 (9th Cir. 2004) (*citing INS v. Ventura*, 537 U.S. 12, 16 (2002)).  Generally, an award

10  of benefits should be only directed when: (1) the ALJ has failed to provide legally

11  sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that

12  must be resolved before a determination of disability can be made, and (3) it is clear from

13  the record that the ALJ would be required to find the claimant disabled were such

14  evidence credited.  *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

15         Here, consideration of Dr. Paniccia's opinion in the full treatment context may

16  have led the ALJ to assign a different weight to his opinion, a different RFC, and

17  ultimately a different vocational expert determination.  Thus, it is appropriate to

18  **REMAND** the matter for further proceedings.  *See Clark*, 2018 WL 948489, at *2 (S.D.

19  Cal. Feb. 20, 2018).  On remand for this issue, the ALJ should reconsider Dr. Paniccia's

20  opinions, taking account of all the *Trevizo* factors, and determine the proper weight to

21  assign to the opinion in light of all other evidence of record.

22                          **C.    State Agency Doctor Opinions**

23         Plaintiff contends that the ALJ erred in giving "considerable weight" to the State

24  Agency's doctors because their opinions were based on excluded evidence.  ECF No. 18-

25  1 at 18.  In particular, the State Agency doctors gave "great weight" to the opinion of

26  another doctor, Dr. Camellia Clark, both on initial review (by Dr. Amado) and

27

28

reconsideration (by Dr. Funkenstein).[3]  AR 94, 134.  Dr. Clark was ultimately disciplined and terminated, and the ALJ sustained Plaintiff's attorney's objection to considering Dr. Clark's opinion, stating that the opinion "will be discussed no further in this decision." AR 20-21.  Thus, Plaintiff argues that the State Agency opinions that relied at least partially on Dr. Clark's opinion should likewise be rejected.  ECF No. 18-1 at 19.

Defendant argues that notwithstanding the State Agency doctor's reliance on Dr. Clark's opinion, their determinations are supported and consistent with other evidence in the record.  ECF No. 19-1 at 9.  Thus, he argues that even if there was error here, it was harmless.  *Id.*

Plaintiff attempts to make an analogy for this situation to the "fruit of the poisonous tree" doctrine in the criminal context.  ECF No. 18-1.  However, Plaintiff does not provide any citations to cases in the social security benefits review context that would suggest there is such a blanket rule that opinions relying on thrown out opinions must be thrown out as a matter of course.  Different context, penalties, and motivations apply to that doctrine in the criminal context.  The Court finds no reason to apply such a bright line rule here.

Here, the ALJ does give other reasons for why he gave considerable weight to the State Agency opinions.  The ALJ relied on their opinion that Plaintiff could "learn, retain, and implement 1-2 step instructions" and would be "limited to no more than incidental contact with the public and no intense/prolonged interaction with prospective coworkers or supervisors."  AR 27.  The ALJ stated that the opinions are "broadly consistent with the evidence at the time of their review of the record."  *Id.*  Specifically, the ALJ points to Plaintiff having good hygiene and being dressed appropriately, good eye contract and speech, and alert, goal-oriented, logical, and linear thought-processes.  *Id.*  Plaintiff was also able to interact appropriate with medical providers and leave his home to attend the

---

[3] Reference to Dr. Clark's opinion is noted as "Valette and Associates," dated July 21, 2015.

appointments himself. *Id.* On examination, Plaintiff was also able to recall three out of three on immediate recall and in five minutes. *Id.* Thus, while the ALJ did rely on Dr. Clark's opinion, he also gave other independent reasons to support the findings he took away from the State Agency doctors.

Moreover, Dr. Clark's opinion in substance was similar to other opinions that was given great weight by the ALJ and is not challenged by Plaintiff—namely, the opinion of Dr. Vandenburgh. Dr. Vandenburgh similarly found no limitations in ability to understand instructions, no limitation in ability to complete simple and detailed tasks, capable of handling funds, and no limitation in ability to avoid normal work hazards. AR 584, 885-887. In fact, Dr. Clark found even more severe limitations in the following areas, finding a moderate limitation compared to Dr. Vandenburgh's none or mild limitation: ability to socially interact with others at an age-appropriate level; limitations in ability to sustain an ordinary routine without sustained supervision; and limitation in ability to concentrate for at least two-hour increments at a time. *Id.* The only finding that was more severe in Dr. Vandenburgh's opinion is that Plaintiff had a moderate limitation in his ability to complete complex tasks whereas Dr. Clark found no limitation. *Id.* However, with regard to this, the State Agency doctor's nonetheless found that Plaintiff could only learn, retain, and implement 1-2 step instructions.

Thus, the Court finds that the State Agency doctors' reliance on Dr. Clark's opinion does not constitute harmful error because both medical evidence and other doctor opinions supported their conclusions. The Court finds that the ALJ did not err on this issue.

### D.    Plaintiff's Mother's Third Party Statement

Plaintiff contends that the ALJ erred in giving little weight to his mother's third-party function report because the ALJ failed to provide legitimate reasons to reject the opinion. The ALJ identified the following two reasons: (1) "due to their inconsistency with the objective medical evidence and medical opinions of record;" and (2) because she did "not have the medical training necessary to make exacting observations as to dates,

frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms."  AR 26.  The Court will address each of these reasons.

For the first reason—inconsistency with the medical record—the parties cite to conflicting cases to support their respective positions.  Plaintiff cites to *Diedrich v. Berryhill*, which held that "lack of support from the 'overall medical evidence'" was not a germane reason to disregard lay testimony because "the fact that lay testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing."  874 F.3d 634, 640 (9th Cir. 2017).  On the other hand, Defendant cites to *Bayliss v. Barnhart*, which held that rejecting testimony of friends and family that was not "consistent with the record of plaintiff's] activities and the objective evidence in the record" was not error.  427 F.3d 1211, 1218 (9th Cir. 2005).

Other courts have grappled with these two seemingly contradictory positions. Some courts have decided to follow *Bayliss* rather than *Diedrich* because *Diedrich* relied on two prior cases which relied on regulations which have since been superseded.  *Smith v. Berryhill*, No. 18-CV-00887-VKD, 2019 WL 4848165, at *23 (N.D. Cal. Sept. 30, 2019).  The regulations now expressly state that "any symptom-related functional limitations and restrictions which you . . . or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . in reaching a conclusion as to whether you are disabled."  20 C.F.R. § 404.1529(c)(3) (2016); *see also* 20 C.F.R. § 416.929(c)(3) (2016).  Thus, these courts have followed *Bayliss*.  *Smith*, 2019 WL 4848165, at *23; *see also Spurlock v. Colvin*, No. EDCV 14-01521-JEM, 2015 WL 1735196, at *9 (C.D. Cal. Apr. 16, 2015).

Other courts have made a distinction between whether the ALJ's rejection was because the third party statement was "inconsistent" with the medical evidence or simply "lacked support" or was not "corroborated" by the medical evidence.  These courts have held that the first reason is a proper reason to reject testimony under *Bayliss*, but the

second is not under *Dietrich* and the cases its relied upon.  *See, e.g.*, *Lacie R. v. Berryhill*, No. 6:17-CV-1952-SI, 2019 WL 1919168, at *10 (D. Or. Apr. 30, 2019); *Starlyn B. v. Comm'r, Soc. Sec. Admin.*, No. 6:17-CV-1897-SU, 2019 WL 4786959, at *12 (D. Or. Mar. 22, 2019), report and recommendation adopted, No. 6:17-CV-01897-SU, 2019 WL 4786047 (D. Or. Sept. 29, 2019); *Tambra J. v. Saul*, No. C19-6094-MAT, 2020 WL 3798939, at *3 (W.D. Wash. July 7, 2020).

Still yet, other courts have chosen to follow *Diedrich* even when the ALJ stated that the testimony was "inconsistent" with the medical record.  *See, e.g.*, *Young v. Saul*, No. 19-CV-01965-PJH, 2020 WL 3506805, at *25 (N.D. Cal. June 29, 2020); *Pena v. Saul*, No. 119CV00780AWISKO, 2020 WL 3867651, at *12 (E.D. Cal. July 9, 2020), report and recommendation adopted sub nom. *Pena v. Sau*, No. 119CV00780AWISKO, 2020 WL 5891573 (E.D. Cal. Oct. 5, 2020).

In evaluating these different positions, the Court is persuaded by the distinction between "inconsistent" statements and those without "support" or "corroboration" in the record.  If there is a true inconsistency, the ALJ is permitted to resolve the inconsistency and choose to rely on the medical evidence instead.  However, if there is simply a lack of support or mention in the medical record, the rationale described in *Diedrich* is persuasive—that "third-party function reports may offer a different perspective than medical records alone" and should be considered for that reason, to supplement the medical record.  Under this rubric, *Bayliss* should apply.  However, the Court finds that even under *Bayliss*, the ALJ has not provided a germane reason.

The ALJ here only states the following:  "The undersigned gives little weight to her statements, due to their inconsistency with the objective medical evidence and medical opinions of record."  AR 26.  There is no further explanation of what the exact inconsistencies are.  Courts have found that *Bayliss* is not satisfied where there is no explanation that at least alludes to what the inconsistences at issue are.  *See, e.g.*, *Deborah L. G. v. Comm'r of Soc. Sec.*, No. 6:19-CV-00308-BR, 2020 WL 2614631, at *8 (D. Or. May 22, 2020) ("Although the ALJ stated [the third party's] statements were

36

'inconsistent' with the medical evidence that Plaintiff had full strength and normal range of motion and that her mental status was 'wholly normal,' the ALJ did not explain how the medical evidence contradicted [the third party's] statements"); *Peter T. H. v. Saul*, No. 2:18-10680 ADS, 2020 WL 1441102, at *5 (C.D. Cal. Mar. 24, 2020) ("The ALJ failed to identify which testimony she found not credible, and explain which treatment records, which clinical findings, or which daily activities were allegedly inconsistent with that testimony."); *Tambra*, 2020 WL 3798939, at *3 (finding *Bayliss* satisfied where the ALJ "identified specific inconsistencies therein"); *Starlyn*, 2019 WL 4786959, at *12 (finding it borderline acceptable that ALJ stated that third party report was contrary to medical record and cited to several exhibits). As these courts have found, "[t]his catch-all, without further specificity, is insufficient for review." *Peter T.H.*, 2020 WL 1441102, at *5; *see Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (as amended) (ALJ must identify "which testimony she found not credible, and . . . explain[ ] which evidence contradicted that testimony"); *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (an ALJ must "elaborate on which daily activities conflicted with which part of [the] testimony"). Accordingly, the Court finds that this first reason was not a germane reason to disregard Plaintiff's mother's testimony.

For the second reason—lack of medical training—Defendant cites to *Gump v. Commissioner of Social Security*, which found that the ALJ properly rejected the "wife's testimony that contained medical conclusions 'on how [plaintiff's] mental and/or physical impairments impact his overall abilities to perform basic work activities at various exertional levels,'" when the ALJ "noted that [the] wife was not competent to render medical opinions." 222 F. App'x 553, 555 (9th Cir. 2007). This is an accurate statement of the law, but cases make a distinction between lay testimony that appears to assert medical diagnoses and conclusions versus that which only describes observations on how a claimant's condition impacts his ability to work. *See, e.g.*, *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (holding lay witnesses may not "mak[e] medical diagnoses" but "lay witness testimony as to a claimant's symptoms or how an impairment affects

37

1   ability to work is competent evidence"); *Gutierrez v. Colvin*, 208 F. Supp. 3d 1117, 1125

2   (E.D. Cal. 2016) (holding that "no medical training" is not a proper reason to reject

3   parents' testimony where they have had opportunity to observe plaintiff); *Wilkerson v.*

4   *Astrue*, No. EDCV 10-01940-SS, 2011 WL 3419520, at *12 (C.D. Cal. Aug. 4, 2011)

5   (holding that mother not being a medical professional was not a germane reason to reject

6   "her opinions as to how Plaintiff's mental condition affected Plaintiff's ability to

7   concentrate and work").

8           Thus, the question of whether this reason is valid turns on what kind of testimony

9   Plaintiff's mother gave.  Some of her testimony is more akin to permissible lay

10   testimony.  She testified as to Plaintiff's inability to get up on time, forgetting his

11   schedule, being too depressed to go to work, forgetting to call in to work, sleeping all

12   day, is isolated with no less interaction with others, and cannot handle stress.  AR 295-

13   302.  This is more like permissible lay testimony than impermissible medical opinions.

14   *See Wilkerson*, 2011 WL 3419520, at *11 (permissible lay testimony included noting that

15   plaintiff "[had] difficulty completing tasks, concentrating, following instructions, and

16   getting along with others . . . because of his bipolar condition," did not "have the patience

17   to read instructions and walked off from work or [] was sent home for not getting along

18   with others . . . because of his language and outbursts," and that he does "not get along

19   with authority figures"); *Goolsby v. Berryhill*, No. 15cv615-JLT, 2017 WL 1090162, at

20   *7 (E.D. Cal. Mar. 22, 2017) (finding ALJ's reason for rejecting a lay witness statement

21   was improper where the witness offered personal observations of plaintiff's struggles

22   with his condition).  Because at least some of this testimony cannot be dismissed simply

23   because Plaintiff's mother did not have medical training and the ALJ's opinion fails to

24   specify which part of the mother's report was dismissed for this reason, the Court finds

25   that the ALJ erred.

26           Thus, in summary, the Court finds that neither of the reasons the ALJ provided are

27   proper for disregarding Plaintiff's mother's testimony.  Having found error, the Court

28   finds that remand is the proper course of action.  Here, even though the Court finds error

1   that the ALJ rejected Plaintiff's mother's testimony by only stating that her testimony
2   was inconsistent with the medical record without further details and because she lacked
3   medical training, it is not clear whether the ALJ would determine Plaintiff to be disabled
4   or change his RFC determination if the testimony was adopted.  Thus, it is appropriate to
5   **REMAND** the matter for further proceedings.  *See Dodrill v. Shalala*, 12 F.3d 915, 919
6   (9th Cir. 1993) (remanding the matter for the ALJ to "articulat[e] specific findings" for
7   rejecting the testimony of the lay witness).  On remand, the ALJ must reconsider
8   Plaintiff's mother's third party function report.  If the ALJ determines that part of it
9   should be credited and part should be disregarded, he should specify what testimony is
10  being disregarded and for what reason.

### E.   Plaintiff's Daily Activities

12      Plaintiff argues that the ALJ did not sufficiently credit his account of his daily
13  activities.  ECF No. 18-1 at 19-21.  Plaintiff cites to *Garrison v. Colvin*, which cautioned
14  ALJs to be cautious when concluding that daily activities are inconsistent with plaintiffs'
15  subjective pain testimony because "impairments that would unquestionably preclude
16  work and all the pressures of a workplace environment will often be consistent with
17  doing more than merely resting in bed all day."  759 F.3d 995, 1016 (9th Cir. 2014); *see*
18  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) ("[M]any home activities are not easily
19  transferable to what may be the more grueling environment of the workplace, where it
20  might be impossible to periodically rest or take medication.").

21      Defendant argues Plaintiff fails to point out that the ALJ did not solely rely
22  inconsistencies with daily activities to partially discount Plaintiff's subjective pain
23  testimony but also with inconsistencies throughout the medical record.  ECF No. 19-1 at
24  9-11.  Moreover, Defendant argues that the daily activities were consistent with RFC
25  determined by the ALJ.

26      In step four, the ALJ determined that plaintiff's statement regarding the intensity,
27  persistence, and limiting effects of his impairments "are not entirely consistent with the
28  medical evidence and other evidence in the record."  AR 25.  Part of this determination is

based on the ALJ's perceived contradictions with daily activities.  The ALJ noted that plaintiff was able to perform various activities inside and outside the home, such as reaching, taking care of animals, driving, leaving his home, shopping for personal items, playing video games, using a computer, and playing the guitar.  AR 26.  The ALJ specifically noted that playing video games "requires the ability to be responsive to instructions in order to navigate through the complexities of each level in order to achieve a specific goal" and "typically require[s] both situational and spatial awareness to avoid the hazards presented in the game; and the ability to concentrate for periods of time."  AR 26.

The ALJ does cite to significant medical evidence in addition to support his finding of inconsistencies with Plaintiff's subjective testimony.  AR 25-28.  However, as noted above, the Court has found error in the ALJ's treatment of Plaintiff's mother's testimony.  Plaintiff's mother provides additional testimony on plaintiff's daily activities.  For example, she provided testimony on Plaintiff's daily activities, caring for pets/others, sleep patterns, house and yard work, getting around, shopping, hobbies and interests, social activities, and his abilities.  AR 296-301.  Because the Court is remanding the case for the ALJ to reevaluate Plaintiff's mother's testimony, including daily activity testimony, the Court declines to rule on this issue at this time and **REMANDS** for the ALJ to reconsider Plaintiff's daily activities against the medical evidence to determine an appropriate RFC.

### F.     The ALJ's RFC Assessment

Plaintiff also argues that ALJ's determined RFC is inadequate because it does not account for his anxiety and fails to address his ability to sustain work specifically with regards to Dr. Paniccia's opinion.  Defendant counters that the RFC was consistent with the medical evidence of record, with Plaintiff's ability to engage in various activities, and with the opinions of Dr. Vandenburgh and other state agency physicians.

As discussed above, the Court is remanding this case in order for the ALJ to reevaluate Dr. Paniccia's opinions and Plaintiff's mother's third party function report.

Since these both may result in changes to the RFC if either opinion are afforded more weight than they are now, the Court declines to rule on this issue at this time and **REMANDS** the issue of the appropriate RFC for the ALJ to determine in light of the other issues discussed previously.

## IV.   CONCLUSION

In conclusion, the Court finds that the ALJ erred in failing to consider all relevant factors in determining the appropriate weight to assign to Dr. Paniccia's opinion and in assigning little weight to Plaintiff's mother's third party function report for insufficient reasons, but did not err for the other reasons argued by Plaintiff.  Accordingly, the Court **GRANTS IN PART** and Plaintiff's motion for summary judgment and **DENIES** Defendant's cross motion for summary judgment.  Consistent with this order, the case is **REMANDED** for further administrative proceedings consistent with this opinion.  *See* 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated:  November 25, 2020

Hon. Nita L. Stormes
United States Magistrate Judge